**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM HAWKINS, *et al.*, | |
|     Plaintiffs, | |
|      v. | Civil Action No. 09-1831 (JEB) |
| DISTRICT OF COLUMBIA, *et al.*, | |
|     Defendants. | |

## <u>MEMORANDUM OPINION</u>

After he criticized a new crime-prevention strategy in the *Washington Post*, the D.C. Metropolitan Police Department disciplined Detective William Hawkins for talking to the media without authorization.  Hawkins and his union, the Fraternal Order of Police, sued.  In the wake of a previous motion to dismiss, all that remains of the suit is Plaintiffs' claim against the District of Columbia under 42 U.S.C. § 1983, asserting that Hawkins's discipline and MPD's media policy violate the First Amendment.  The parties have now cross-moved for summary judgment, and each wins a round.  Concluding that Hawkins's discipline violated the First Amendment, but that the media policy passes constitutional muster, the Court will grant both Motions in part and deny both in part.

**I.      Background**

    A.  <u>Factual Background</u>

Although the Court laid out the Complaint's allegations in a previous Opinion, <u>see</u> <u>Hawkins v. Boone</u> (<u>Hawkins I</u>), 786 F. Supp. 2d 328 (D.D.C. 2011), the analysis here begins anew, as summary judgment requires evidence, not just allegations.  Yet, in looking at the evidence, the Court finds that the material facts at issue are essentially undisputed.

1

1. *General Order*

The Metropolitan Police Department regulates its members' (*i.e.*, employees') disclosures of information to the media through General Order 204.01.  See Gov't Mot., Exh. F (MPD, Gen. Order 204.01, Media (Apr. 13, 2001)).  The General Order strikes a balance between the public's right to certain information about police activity and MPD's needs for accuracy in public communications and for, in some instances, secrecy about police work.  See id. at pt. I.  The Order's key regulations decree who may release information, what categories of information they may release, and under what circumstances.  See id. at pt. VI.

Three of those regulations are particularly relevant here.  The first two are the regulations that Detective Hawkins was found to have violated:

> 1. Members may provide the basic facts, unless otherwise restricted by this General Order, concerning an event or incident of which they have sufficient knowledge, in conjunction with a Unit Official's approval, the rank of lieutenant or above.
> 2. Only the Chief of Police, Command staff and members designated by them may release information pertaining to Department policies, procedures, rules, personnel issues and direction.

Id. at pt. VI.A (citation omitted).  The third is the rule for how members may express a personal view:

> If a member is participating in an interview to express personal views, the member shall:
> a. appear or participate only during non-duty status, unless otherwise directed;
> b. ensure that the interview will not be conducted at a police facility without [Public Information Office] authorization;
> c. preface any comments with a clear statement that he or she is expressing a personal viewpoint and not that of the Department;
> d. be prohibited from appearing in uniform or wearing any Department insignia or item which would indicate he or she is the Department's spokesperson; and,
> e. not endorse any products or services.

Id. at pt. VI.F.2.

### 2. *Discipline of Hawkins*

William Hawkins has worked for MPD since 1990, and he has been a detective since 1998.  See Gov't Mot., Exh. A (Dep. of William Hawkins) at 9:4-22.  As a detective, Hawkins primarily investigates burglaries and thefts.  See id. at 10:6-13.  He has been a member of the Fraternal Order of Police ("the Union") since 1990 but had minimal involvement with the organization before the events at issue in this case.  See id. at 14:10-16:5.

In June 2009, Hawkins was assigned to a burglary at Janice Delaney's Capitol Hill home. See id. at 16:6-9.  Delaney e-mailed Hawkins with a partial list of stolen items on Monday, June 22, saying that she was "very anxious to get this investigation underway."  Pls. Mot., Exh. 1 (E-mail from Delaney to Hawkins (June 22, 2009)).  On Tuesday, June 23, Hawkins responded as follows:

> Unfortunately I will not get to work on your case for quite a while.  I'm day off this week Wednesday and Thursday.  Friday, Saturday, and Sunday I'm being sent to the second district[ ](upper Georgetown) for All Hands On Deck this weekend.  I'm day off next Monday the 29th.  Tuesday, Wednesday, Thursday in mandatory training class at the police academy.  Day off next Friday the 3rd.  The 4th Holiday somewhere downtown area not even close to the fireworks.  The week after that is another AHOD with Wednesday [the 8th] and Thursday [the 9th] as days off.
> Looks like 7/5, 7/6, and 7/7 are free to investigate my crime victim's cases.

Pls. Mot., Exh. 2 (E-mail from Hawkins to Delaney (June 23, 2009)).  In other words, Hawkins told Delaney that he would not get to her case for at least twelve days – in large part because of duties stemming from All Hands on Deck.  The All Hands on Deck initiative flooded high-crime areas with D.C. police officers and detectives over select weekends in hopes that the additional police presence would deter crime.  The initiative had been a significant bone of contention

between the Union, which fought All Hands on Deck's additional burden on police officers, and the D.C. Police Chief, who initiated and strongly backed All Hands on Deck.

After receiving Hawkins's e-mail, Delaney complained to Hawkins's supervisor and asked him to "reassign this case to a detective who is free to work on it now." Pls. Mot., Exh. 3 (E-mail from Delaney to Inspector Michael Reese (June 23, 2009)). Fearing disciplinary action, Hawkins reached out to the Chairman of the Union, Kristopher Baumann. See Hawkins Dep. at 72:20-73:19.

Hawkins's e-mail to Delaney soon became public, apparently after Delaney herself forwarded it to the media. See Dep. of Kristopher Baumann at 37:22-38:15;[1] Hawkins Dep. at 55:1-5. When a *Washington Post* reporter writing a story about All Hands on Deck asked Baumann for someone to talk to, he directed her to Hawkins, who had complained about the program. See Baumann Dep. at 40:5-42:8, 43:13-44:16, 46:2-19. According to Baumann and Hawkins, Baumann authorized Hawkins to speak to the reporter on behalf of the Union. See id. at 42:22-43:1, 44:13-16, 45:18-46:1; Hawkins Dep. at 94:9-11. Hawkins took the reporter's call on his own cell phone while on his way to work. See Hawkins Dep. at 95:7-96:7. She already had Hawkins's e-mail to Delaney, and Hawkins confirmed that the e-mail was true. See id. at 96:15-17, 97:15-16. Hawkins also shared his concerns about All Hands on Deck. See id. at 96:18-97:14. Hawkins never told the reporter his official rank, but he also never asked to be identified as a member of the Union. See id. at 97:21-98:14.

The *Washington Post* story appeared shortly thereafter. Entitled "Not Everyone's Aboard High-Profile Crime Initiative," the article quoted victims and detectives complaining that the All

---

[1] Baumman's deposition is split across the parties' filings, with Exhibit 4 to Plaintiffs' Motion containing pages 34-41, and Exhibit D to the Government's Motion containing pages 1-9 and 42-57.

Hands on Deck initiative prevented detectives from solving crimes in a timely manner.  The

middle third of the story featured Hawkins and the Capitol Hill burglary:

> [Chief of Police Cathy] Lanier spokeswoman Traci Hughes said the program has not caused widespread problems for detectives.  "Detectives are scheduled . . . on a rotational basis to avoid disruptions in their investigations," she said.
>
> But some detectives don't see it that way.  They say that All Hands assignments interrupt investigations and that investigators often take comp days after working the overtime shifts, further delaying their return to pending cases.  An exception is made for homicide detectives, who are exempt from All Hands shifts.
>
> Detective William Hawkins, for instance, pointed to a Capitol Hill burglary case that he was working last month.  He said he received an e-mail from the victim that provided an updated list of missing items, including electronics and jewelry, along with the potential value of the items.
>
> "I'm very anxious to get this investigation underway and to get a police report to give to the insurance company," wrote the woman, who asked not to be named for fear of being targeted again.
>
> Hawkins responded in an e-mail the next morning that he would not get a chance to work on the case "for quite a while."  He was scheduled for two days off and then had to report to Georgetown for an All Hands on Deck assignment.  After that, he had mandatory training at the police academy, followed by a day off, a special Fourth of July detail and another All Hands on Deck.
>
> "Looks like 7/5, 7/6 and 7/7 are free to investigate my crime victim's cases," Hawkins wrote in the e-mail.
>
> The resident wrote a follow-up message to a supervisor, Inspector Michael Reese, asking that her case be assigned right away.  "After the attentive and painstaking work . . . it seems odd that this case would be virtually abandoned for at least two weeks," she wrote.
>
> Reese declined to comment.  Hawkins said he was able to check with a couple of pawnshops on his days off.  He's scheduled to work the next All Hands the weekend of July 24.
>
> "There are burglaries and serious assaults and armed robberies that are set aside because of AHOD," said Hawkins, a detective for 11 years.  "Detectives should be exempt because it jeopardizes cases."

Gov't Mot., Exh. C (Theola Labbé-DeBose, "Not Everyone's Aboard High-Profile Crime

Initiative," WASH. POST, July 17, 2009, at B1) (omissions in original).

Disciplinary inquiries soon ensued.  The initial investigation found that Hawkins had violated Parts VI.A.1 and VI.A.2 of the General Order by speaking to the media about MPD's policies without notifying his supervisor or the Public Information Office.  See Gov't Mot., Exh. E (Memorandum from Sgt. Thomas E. Boone to Assistant Chief of Police, Office of Prof'l Responsibility (Aug. 5, 2009)) at 3.  The investigation recommended a dereliction report.  See id. at 4.  Hawkins grieved the action to the Police Chief, who denied the grievance but substituted a lesser penalty.  See Gov't Mot., Exh. G (Cathy L. Lanier, Chief of Police, Step 2 Grievance of Detective William Hawkins (Sept. 9, 2009)).  She ordered a Documentation of Counseling to be placed in Hawkins's performance-documentation file "to remind him of the requirement to make proper notifications in the future and failure to do so will result in progressive discipline."  Id. at 1.  No further discipline occurred.

    B.  Procedural Background

Plaintiffs filed suit in the D.C. Superior Court, alleging that the District and three individual officers involved in Hawkins's discipline had violated the D.C. Whistleblower Protection Act and 42 U.S.C. § 1983.  Defendants removed the case to this Court and filed a motion to dismiss.  Granting the motion in part, the Court dismissed both the whistleblower claim (no *prima facie* case) and the § 1983 claim against the individual Defendants (qualified immunity).  See Hawkins I, 786 F. Supp. 2d at 332-35, 337-38.  The § 1983 claim against the District, however, survived.  See id. at 335-37.  With discovery now complete, both parties have cross-moved for summary judgment on this sole remaining count.

## II.  Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-

movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006);

Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for

summary judgment, the Court must "eschew making credibility determinations or weighing the

evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham

v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby,

477 U.S. at 249-50.

## III.    Analysis

Although the Complaint contained only one count alleging a violation of § 1983 (Count

II), briefing slowly revealed that Plaintiffs in fact raise two distinct claims in that cause of action.

First, both Hawkins and the Union challenge the General Order's regulation of media

communications as unconstitutional on its face.  Second, Hawkins alone asserts that his

discipline for speaking to the *Washington Post* violated his constitutional speech rights.  The

Court will separate these two First Amendment analyses, considering each in turn.

Before doing so, the Court quickly notes that the District remains a proper § 1983

Defendant here, a point not challenged by the Government.  A municipality may be sued directly

under § 1983 for its own unconstitutional policies and for unconstitutional acts taken by officials

with final policymaking authority in the relevant area.  See Monell v. Dep't of Social Servs., 436

U.S. 658 (1978) (policies); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) (officials).  The

General Order falls into the former category, and the Police Chief's discipline of Hawkins falls

into the latter.

A.  General Order 204.01

According to Plaintiffs, the General Order on its face suffers from the full gamut of First

Amendment infirmities, including vagueness, overbreadth, and acting as a prior restraint on

protected speech.  See Fire Fighters Ass'n, D.C. v. Barry, 742 F. Supp. 1182, 1197 (D.D.C.

1990) (striking down D.C. firefighter regulation as vague and overbroad).  Plaintiffs are indeed

correct that "public employees do not surrender all their First Amendment rights by reason of

their employment.  Rather, the First Amendment protects a public employee's right, in certain

circumstances, to speak as a citizen addressing matters of public concern." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 417 (2006).  For the Constitution to kick in, however, a public employee must be restricted from speaking "as a citizen" – that is, the restrictions must go beyond regulating speech that occurs "pursuant to the employee's official duties." <u>Id.</u> at 413, 421.  "If an employee does not speak as a citizen . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." <u>Borough of Duryea, Pa. v. Guarnieri</u>, 131 S. Ct. 2488, 2493 (2011) (internal quotation marks omitted); <u>see also</u> <u>United States v. Nat'l Treasury Emp. Union</u>, 513 U.S. 454, 466-68 (1995) (same for preemptive ban on certain speech).

Plaintiffs' difficulty here is twofold: the regulations they attack do not govern protected speech, and they offer no challenge to the regulation that does.  The portions of the General Order they primarily complain of are in Part VI.A and state:

> 1.  Members may provide the basic facts, unless otherwise restricted by this General Order, concerning an event or incident of which they have sufficient knowledge, in conjunction with a Unit Official's approval, the rank of lieutenant or above.
> 2.  Only the Chief of Police, Command staff and members designated by them may release information pertaining to Department policies, procedures, rules, personnel issues and direction.

The first section speaks of factual information obtained by an officer in an investigation, and the second concerns descriptions of police policies and procedures.  These clearly regulate only speech meant to inform or update the public with facts and that is made pursuant to a member's official duties, not opinions an officer offers as a citizen.  Indeed, the Order throughout speaks of "releasing information to the media" and making "media releases" – phrasings that suggest conveying information on behalf of MPD (and therefore pursuant to official duties).  <u>See, e.g.</u>, Gen. Order 204.01, at pts. I, II, V.A, VI.A-D.

In addition, the General Order also has a specific subpart (the exception) that applies "[i]f a member is participating in an interview to express personal views." Id. at pt. VI.F.2. The inclusion of a special section regulating the expression of personal views implies that the rest of the General Order does not regulate such expression. In response, Plaintiffs argue that the District's application of the policy to Detective Hawkins shows that the General Order, in fact, does cover speech that members make as citizens. The Court addresses the application of the Order to Hawkins in Section III.B, *infra*. That misapplication of the General Order, however, does not demonstrate its facial unconstitutionality. Part VI.A of the General Order thus does not cover protected speech.

The exception in the General Order (in Part VI.F), on the other hand, does regulate members' offering of personal views – *i.e.*, speech as a private citizen. Specifically, members who "participat[e] in an interview to express personal views" are required to be off-duty and off-site, to preface any comments "with a clear statement that [they are] expressing a personal viewpoint and not that of the Department," not to wear a uniform or police insignia, and not to "endorse any products or services." Gen. Order 204.01, at pt. VI.F.2. Plaintiffs offer no argument as to the exception's unconstitutionality. Indeed, their broad challenges to the General Order – for vagueness and prior restraint, for example – make little sense in the context of these requirements. In the absence of a specific challenge, therefore, the Court cannot find unconstitutional these restrictions on the time, place, and manner of media interviews in which members express personal views.

In sum, most of the General Order regulates conduct that falls outside of the First Amendment's shelter, and Plaintiffs raise no challenges relevant to the regulations that do cover protected speech. The General Order thus survives Plaintiffs' facial attack.

B.  Discipline of Hawkins

To prevail on a First Amendment retaliation claim, the D.C. Circuit requires a public

employee to satisfy a four-pronged test:

> First, the public employee must have spoken as a citizen on a
> matter of public concern.  Second, the court must consider whether
> the governmental interest in promoting the efficiency of the public
> services it performs through its employees outweighs the
> employee's interest, as a citizen, in commenting upon matters of
> public concern.  Third, the employee must show that her speech
> was a substantial or motivating factor in prompting the retaliatory
> or punitive act.  Finally, the employee must refute the government
> employer's showing, if made, that it would have reached the same
> decision in the absence of the protected speech.

Wilburn v. Robinson, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (citations, internal quotation marks,

and ellipses omitted).  The Circuit's articulation of the test obscures two requirements that are

debated here: First, the test is premised on the employer's having taken an "adverse action"

against the employee that rises to constitutional significance.  Tao v. Freeh, 27 F.3d 635, 639

(D.C. Cir. 1994).  Second, the test's first prong really imposes two requirements – that the

employee speak "as a citizen" and that the speech be "on a matter of public concern."  Mills v.

City of Evansville, Ind., 452 F.3d 646, 647 (7th Cir. 2006) ("before asking whether the subject-

matter of particular speech is a topic of public concern, the court must decide whether the

plaintiff was speaking 'as a citizen' or as part of her public job").

Before applying this test, it helps to know which questions are for the court and which are

for the jury.  Of the four prongs, "[t]he first two factors are questions of law for the court to

resolve, while the latter are questions of fact ordinarily for the jury."  Wilburn, 480 F.3d at 1149

(citation and ellipsis omitted).  The threshold "adverse action" question also appears to be legal.

See Tao, 27 F.3d at 637 ("the requirement that Tao submit new lengthy promotion-application

materials is sufficient, as a matter of law, to constitute an 'adverse action' for constitutional

purposes"). As questions of law turn on the underlying facts, however, evidentiary disputes about those facts may preclude summary judgment. See William W. Schwarzer *et al.*, Fed. Judicial Ctr., The Analysis and Decisions of Summary Judgment Motions 13-14, 17 (1991). There is no dispute about what Hawkins actually said, so this Court need not wade into the thicket of the Court's splintered opinion in Waters v. Churchill, 511 U.S. 661 (1994).

The Court, therefore, will address the following five questions in sequence: First, did MPD take an adverse action against Hawkins? Second, was Hawkins speaking as a citizen or as an employee? Third, was he speaking on a matter of public concern? Fourth, how should the Court balance the competing interests? Fifth and finally, is there any genuine factual dispute about causation?

### 1. *Adverse Action*

The Court begins with the threshold question of the test – whether the Government took a constitutionally significant "adverse action" against Hawkins. "Employer action taken against an employee in response to her exercise of free speech need not be as significant as the denial of a promotion to raise a constitutional claim." Tao, 27 F.3d at 639. The First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee when intended to punish her for exercising her free speech rights." Rutan v. Republican Party of Ill., 497 U.S. 62, 76 n.8 (1990) (citation and ellipsis omitted). For example, "a requirement of twenty-seven additional hours of work in order to be considered for promotion constitutes an adverse action sufficient to implicate First Amendment concerns." Tao, 27 F.3d at 639.

Here, the action in question is a Documentation of Counseling. The Police Chief explained that the Documentation of Counseling, placed in Detective Hawkins's "performance

documentation file," would "remind him of the requirement to make proper notifications in the

future and failure to do so will result in progressive discipline."  Lanier, Step 2 Grievance of

Detective William Hawkins at 1 (emphasis added).  So on its face, the document indicates that it

will expose Hawkins to additional punishment in the future.  Hawkins further testified that if he

applies for a promotion, then the Documentation of Counseling "will be considered," and

because MPD assesses reputation by "look[ing] in your personnel file to see what kind of a

person you are," the Documentation of Counseling "will have an impact."  Hawkins Dep. at

162:11-163:3.  By exposing Hawkins to increased discipline and by hindering his future

promotions, the formal Documentation of Counseling seems to inflict sufficient harm.  See Tao,

27 F.3d at 639 ("If employees who exercise free speech find themselves facing more

burdensome promotion requirements than those employees who remain silent, they are unlikely

to speak freely on matters of public concern.").

      The Government offers no meaningful responses to Hawkins on this point.  It begins,

perplexingly, by arguing that "investigations by themselves do not violate the First Amendment."

Gov't Mot. at 17.  Investigations, however, have nothing to do with this case – the adverse action

at issue is the Documentation of Counseling.  The District then asserts that a letter "reminding

[Hawkins] to provide proper notifications when speaking with the media" falls short of

retaliation.  Gov't Reply at 13.  The Court agrees with that argument – a letter that did nothing

more than remind Hawkins to follow the media policy would be harmless (although one might

wonder why the Government would want such a meaningless letter on file, let alone why the

Government would issue such an empty letter after conducting an investigation and finding the

charges of wrongdoing justified).  But the Government's argument does not fit the facts here

because the Documentation of Counseling also opens Hawkins to "progressive discipline" if he

fails to follow the General Order.  Hawkins, moreover, testified that the letter would hurt his future prospects of promotions.  To challenge that testimony, the Government needed more than unsupported allegations or denials.  <u>See</u> Fed. R. Civ. P. 56(e).  As a matter of law, therefore, the Documentation of Counseling constitutes an "adverse action" for First Amendment purposes.

> 2. *Speaking as a Citizen*

The Court now moves to the first part of the first prong – whether Hawkins was speaking "as a citizen" when he talked to the *Post* reporter.  Public employees speak as employees, instead of as citizens, when they "make statements pursuant to their official duties."  <u>Garcetti</u>, 547 U.S. at 421; <u>Bowie v. Maddox</u>, 653 F.3d 45, 48 (D.C. Cir. 2011) ("The critical question under <u>Garcetti</u> is not whether the speech at issue has a civilian analogue, but whether it was performed 'pursuant to . . . official duties.'") (omission in original); <u>Thomson v. District of Columbia</u>, 530 F.3d 914, 916-17 (D.C. Cir. 2008).  Deciding the scope of an employee's duties is a practical inquiry, not a formal one.  <u>See</u> <u>Garcetti</u>, 547 U.S. at 424-25.  While the parties advocate opposite legal conclusions, they have no evidentiary disagreements, so the Court can answer the question presented here as a matter of law.

Hawkins claims that he spoke to the *Post* reporter on behalf of the private Union. Building on that explanation, in <u>Hawkins I</u> the Court often substituted "speak as a Union representative" in place of "speak as a citizen."  <u>See</u> 786 F. Supp. 2d at 335-36.  While the Court will continue to use those phrases interchangeably, Hawkins's exact relationship with the Union should not distract from the dispositive legal question here: whether or not Hawkins spoke to the newspaper pursuant to his official duties.

Hawkins points to various facts suggesting that he spoke as a Union representative instead of as an employee.  For example, he spoke with the reporter on his own cell phone, while

in his own vehicle, before his shift began.  See Hawkins Dep. at 95:7-96:7.  Since these facts

could also apply to a police spokesman, they appear less persuasive than other points.  For

example, the reporter had no affiliation with MPD.  Cf. Mills, 452 F.3d at 648 ("Mills was on

duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged

from Chief Gulledge's briefing.  She spoke in her capacity as a public employee contributing to

the formation and execution of official policy.").  Baumann, the head of the Union, referred the

reporter to Hawkins.  See Baumann Dep. at 40:5-42:8, 46:2-19.  Baumann and Hawkins both

testified, moreover, that Baumann had authorized Hawkins to speak to the reporter on behalf of

the Union.  See id. at 42:22-43:1, 44:13-16, 45:18-46:1; Hawkins Dep. at 94:9-11.  Finally, and

of great significance, Hawkins offered his own personal opinions to her.

    The District, conversely, has its own list of facts suggesting that Hawkins spoke as an

employee.  The Government's overarching argument is that Hawkins's speech "owed its

existence to his professional responsibilities" – that Hawkins spoke about actions he took in his

official capacity.  Gov't Mot. at 10.  For example, Hawkins obviously wrote the e-mail to

Delaney pursuant to his official duties, and he discussed that e-mail with the reporter.  See

Hawkins Dep. at 96:15-21.  This line of argument, however, misses the Garcetti boat.  See 547

U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job.").

Garcetti carves out speech made pursuant to an employee's official duties – not speech "related

to his official duties" or that "concern[s] special knowledge gained through his employment."

Gov't Mot. at 11.  Indeed, as the Supreme Court has recognized, speech related to an employee's

duties – e.g., concerning special knowledge gained through employment – is often the most

important to protect:

> [T]he First Amendment interests at stake extend beyond the
> individual speaker.  The Court has acknowledged the importance

> of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion. <u>Pickering</u> again provides an instructive example.  The Court characterized its holding as rejecting the attempt of school administrators to limit teachers' opportunities to contribute to public debate.  It also noted that teachers are the members of a community most likely to have informed and definite opinions about school expenditures.  The Court's approach acknowledged the necessity for informed, vibrant dialogue in a democratic society.  It suggested, in addition, that widespread costs may arise when dialogue is repressed.  The Court's more recent cases have expressed similar concerns.  <u>See, e.g.</u>, <u>San Diego v. Roe</u>, 543 U.S. 77, 82 (2004) (<i>per curiam</i>) ("Were public employees not able to speak on the operation of their employers, the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it" (citation omitted)); <u>cf.</u> <u>Treasury Employees</u>, 513 U.S., at 470 ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said").

<u>Garcetti</u>, 547 U.S. at 419-20 (some citations, internal quotation marks, and brackets omitted).

Trying another tack, the Government points out that the *Post* article identified Hawkins as a detective and that Hawkins never asked the reporter to identify him as a member of the Union.  <u>See</u> Hawkins Dep. at 98:10-14.  Those facts, however, shed little light on whether he spoke to the reporter pursuant to his official duties.  Hawkins also never told the reporter that he was speaking on behalf of MPD – indeed, he never even told her his rank – and his opinion critical of MPD policies makes manifest that this was not the case.  <u>See</u> <u>id.</u> at 97:21-98:3.

Hawkins is in many ways similar to the high-school teacher in <u>Pickering</u>.  <u>See</u> <u>Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will County</u>, 391 U.S. 563 (1968).  <u>Pickering</u> is the Supreme Court's foundational case in this area, and <u>Garcetti</u> repeatedly uses <u>Pickering</u> to illustrate a public employee speaking as a citizen.  <u>See generally</u> <u>Garcetti</u>, 547 U.S. at 417-24.  Pickering was fired "for sending a letter to a local newspaper in connection with a recently

16

proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools." 391 U.S. at 564.  Like Hawkins, Pickering spoke to the media.  And like Hawkins, Pickering's criticisms of the school board and the superintendent were outside of his job description as they were personal opinion, not factual information, and "in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher."  Id. at 569-70.  Unlike Hawkins, moreover, Pickering specifically identified himself as a teacher and used this fact to bolster his credibility.  See id. at 576 ("I teach at the high school and I know this just isn't the case.").  (Pickering did specify at the end of his letter, however, that he wrote "as a citizen, taxpayer and voter, not as a teacher, since that freedom has been taken from the teachers by the administration."  Id. at 578.)

The Government suggests that "a thoughtful inquiry requires a conclusion that Plaintiff spoke in his official capacity as an employee and not as a union member or representative."  Gov't Mot. at 14 (emphasis in original).  Having, it hopes, conducted such an inquiry, the Court lands in the opposite place.  Indeed, it is hard to fathom a description of Hawkins's job as a detective that would include criticizing the Police Chief's pet policy to the *Washington Post*.  The Court thus concludes that Hawkins spoke to the paper as a citizen, not as an employee.

3. *Speaking on a Matter of Public Concern*

The second half of the first prong – whether Hawkins spoke on a matter of public concern – goes undisputed by the Government.  And for good reason.  A matter is of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  Connick v. Myers, 461 U.S. 138, 146 (1983).  For MPD specifically, "questions of how to rank the Department's law-enforcement priorities" are matters of public

concern.  O'Donnell v. Barry, 148 F.3d 1126, 1133 (D.C. Cir. 1998).  The Government concedes

here that All Hands On Deck has been the subject of an "ongoing public debate" that "has

included extensive media coverage in which the [Union] has been a regular commentator."

Gov't Mot. at 2.  When a leading national newspaper considers speech to be worthy of inclusion

within its pages, as here, that speech almost by definition is on a matter of public concern.  The

Court here thus concludes that Hawkins's speech was on such a matter.

   4. *Balancing of Interests*

  The second prong, finally, raises the key First Amendment balance: whether the

Government's interest in regulating speech to promote the efficient performance of public

services outweighs Hawkins's interest, as a citizen, in speaking about matters of public concern.

In making the determination, courts consider more than the content of the speech:

> [T]he manner, time, and place of the employee's expression are
> relevant, as is the context in which the dispute arose.  We have
> previously recognized as pertinent considerations whether the
> statement impairs discipline by superiors or harmony among co-
> workers, has a detrimental impact on close working relationships
> for which personal loyalty and confidence are necessary, or
> impedes the performance of the speaker's duties or interferes with
> the regular operation of the enterprise.

Rankin v. McPherson, 483 U.S. 378, 388 (1987) (citations omitted); see also id. ("Interference

with work, personnel relationships, or the speaker's job performance can detract from the public

employer's function; avoiding such interference can be a strong state interest.").  The D.C.

Circuit has recognized that "there may be a stronger governmental interest in regulating the

speech of police officers than in regulating the speech of other governmental employees"

because of "the special degree of trust and discipline required in a police force."  O'Donnell, 148

F.3d at 1135.  "[W]hen a police officer speaks out on an issue that he is uniquely qualified to

address," however, courts "must be cautious in accepting the claim that the public interest demands that he be silent."  Id.

Hawkins's interests in speaking are clear.  The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (citation omitted).  Hawkins contributed to the public debate about the wisdom of All Hands on Deck – a debate sufficiently important to garner "extensive media coverage."  Gov't Mot. at 2.  Hawkins, moreover, added a new voice in the debate by drawing on his experiences as an investigating detective to illustrate the costs of All Hands on Deck.  See Pickering, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").  Also favoring Hawkins are the place, time, and manner of his expressions: he spoke outside of work, while off-duty, and directed his speech at the public instead of at his superiors.  Cf. Connick, 461 U.S. at 152-53 (employee prepared and distributed questionnaire to fellow attorneys during work at worksite, interfering with district attorney's office).

The Government claims three opposing interests in regulating Hawkins's speech.  First, it asserts that it needs to prevent speech about ongoing investigations so that they are not jeopardized.  See Gov't Mot. at 15-16.  Not all statements about ongoing cases threaten to jeopardize their investigation, however.  Here, for example, Hawkins could conceivably be accused of disclosing that he was assigned to a Capitol Hill burglary case and that he had been unable to work on the case for a couple of weeks because of his All Hands on Deck duties.  The Government does not explain how those disclosures threatened to compromise the burglary

investigation, and the Court sees no reason why they would have.  The Government's first interest thus proves a poor fit here.

Next, the District proclaims an interest in preventing statements that "cause[] disruption of the MPD's regular operation by presenting an unclear picture, to the public, as to who speaks on behalf of the Department and what types of information concerning investigations may be released."  Gov't Mot. at 16.  Confusion about these issues could chill victims from coming forward and undermine public trust.  See id. at 16-17.  Again, the asserted interest is undoubtedly compelling in the abstract.  Yet, as before, the interest cannot support discipline here.  As to the first issue, it is obvious from the *Washington Post* that Hawkins was not speaking for MPD: No reasonable member of the public would think that a detective is speaking on behalf of MPD when he criticizes his Department's high-profile initiative.  Official spokespeople tend not to criticize official policies.  In any event, the Chief of Police's spokeswoman, who is also quoted in the article, clearly gives MPD's official position.  As to the second issue, Hawkins disclosed no personal details about the crime or the victim.  The Government has given no explanation of why victims would be deterred after reading Hawkins's statement.  The second interest thus fails as well.

Last, the Government claims an interest, recognized in Rankin, in preventing a statement that "impairs discipline by superiors or harmony among co-workers."  483 U.S. at 388.  Unlike the other two interests, this one at least fits the facts.  As Hawkins acknowledged, one of his superiors was "mad as hell" about the *Post* story, apparently because it made MPD's burglary investigation appear incompetent.  Hawkins Dep. at 69:10-13 ("He says, you don't air the Department's dirty laundry in public, you do not do that, referring to the newspaper article.  He was mad.  He was mad as hell.").  The Government certainly has an interest in preventing this

sort of disharmony with superiors.  The Court concludes, however, that this interest in preventing

disharmony is outweighed by Hawkins's interest in speaking.  Hawkins's criticism of All Hands

on Deck would ruffle no more feathers than Pickering's "accusation that too much money is

being spent on athletics by the administrators of the school system."  Pickering, 391 U.S. at 571.

Hawkins further reduced the risk of disharmony by identifying no other colleagues or superiors

besides, only by implication, the Chief herself.  The Court must ultimately conclude that the cost

of some disharmony, at least on the facts here, is worth the benefit of a public employee's

offering his perspective on how a major policy by MPD is failing.

   Finally, the District has a difficult time prevailing on the balancing where MPD seems to

have misapplied its own General Order in disciplining Hawkins.  Cf. Connick, 461 U.S. at 153 &

n.14 (violation of announced office policy strengthens employer's claim); Mt. Healthy City Sch.

Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 284 (1977) (same).  His speech to the *Post* does not

fall under Part VI.A since he was neither providing basic facts about an event nor releasing

information about MPD policies.  Instead, he was offering his personal opinion about the All

Hands on Deck initiative.  See Gov't Opp. at 8-10 (Part VI.A inapplicable when MPD member

speaks as citizen).  The manner in which he did so, furthermore, appears to comply with the

exception in Part VI.F.  In other words, he spoke while off-duty, not at a police facility, not

appearing in uniform, and without endorsing anything.  The only quibble MPD might have is

with his possible failure to preface his comments with the disqualifier that they were his personal

views.  The content of his words makes this point so obvious that the preface would seem

superfluous.  An apparent misapplication of its own General Order, therefore, is the final reason

that the balance tips in Plaintiff's favor.  The Court concludes that, as a matter of law, Hawkins's

interest in speaking here outweighs the Government's interest in muzzling him.

5.   *Causation*

We are left, then, with the third and fourth prongs, which deal with causation.  While these prongs normally present questions of fact, the facts here are so clear that no genuine issues of dispute remain.  On the third prong – whether Hawkins's speech was a substantial or motivating factor in prompting the retaliatory or punitive act – the Documentation of Counseling itself says the discipline is for Hawkins's media contact.  See Lanier, Step 2 Grievance of Detective William Hawkins at 1 ("In this case, you violated this directive by making statements to the media without proper notification. . . .  I have decided to rescind the PD 750, and replace it with a PD 62E Documentation of Counseling to be placed in Detective Hawkins' performance documentation file to remind him of the requirement to make proper notifications in the future and failure to do so will result in progressive discipline.").  The fourth prong comes into play only if the Government shows "that it would have reached the same decision in the absence of the protected speech."  It has not attempted such a showing.  Unlike the typical case, where a firing or transfer or failure to promote can have many plausible explanations, the discipline here was expressly tied to Hawkins's speech.  Hawkins thus prevails on both prongs.

In sum, Hawkins emerges victorious on every prong as a matter of law, and the District therefore violated the First Amendment by disciplining him for speaking to the *Washington Post*.  All that remains for the jury is a determination of damages.

**IV.    Conclusion**

For the aforementioned reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment and will grant in part and deny in part the Government's Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: February 11, 2013